ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
Email: andrew@packardlawoffices.com
          wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

DAVID WILLIAMS (State Bar No. 144479)
Law Offices of David Williams
1839 Ygnacio Valley Road, Suite 351
Walnut Creek, CA 94598
Tel: (510) 847 2356
Fax: (925) 332-0352
E-mail: dhwill7@gmail.com

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>EUREKA READY MIX LLC, doing business as EUREKA READY MIX CONCRETE COMPANY, INC., ROBERT MCLAUGHLIN, and MICHAEL MCLAUGHLIN,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Eureka Ready Mix LLC, doing business as Eureka Ready Mix Concrete Company, Inc., Robert McLaughlin, and Michael McLaughlin ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.     On or about June 29, 2020, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the North Coast Regional Water Quality Control Board ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of CATs' CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Humboldt County, California.

II.    **<u>INTRODUCTION</u>**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately 24-acre facility owned and/or operated by Defendants (the "Facility").  The Facility is located at 4945 Boyd Road, in Arcata, California.  Defendants discharge pollutant-contaminated storm water from the Facility into the Mad River, which flows into the Pacific Ocean.  Mad River and the Pacific Ocean are waters of the United States.  Defendants are violating both the substantive and procedural requirements of the CWA.

6.      Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.      The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as Mad River.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.

### III.   **PARTIES**

8.      CATs is a non-profit public benefit corporation organized under the laws of California, based in Arcata, California.  CATs is dedicated to the defense of the environment from the effects of toxic chemicals, and the preservation and protection of the wildlife and natural resources of California waters, including the waters into which Defendants discharge polluted storm water.  To further its goals, CATs actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of CATs, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near Mad River, into which Defendants cause pollutants to be discharged.  These CATs members use and enjoy the impacted waters for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendants' discharge of storm water containing pollutants impairs each of those uses.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

10.      Members of CATs reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CATs use and enjoy the waters of Mad River, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CATs use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CATs' members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

11.      Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility, and are subject to the terms of the General Permit.

12.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or

1  adequate remedy at law.

2  **IV.     LEGAL BACKGROUND**

3          **A.     Clean Water Act**

4          13.     Congress enacted the CWA to "restore and maintain the chemical, physical, and

5  biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim

6  goal of water quality which provides for the protection and propagation of fish, shellfish, and

7  wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these

8  ends, Congress developed both a water quality-based and technology-based approach to regulating

9  discharges of pollutants from point sources into waters of the United States.

10         14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

11 pollutant from a point source into waters of the United States, unless such discharge is in compliance

12 with various enumerated sections of the Act. Among other things, Section 301(a) prohibits

13 discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to

14 Section 402 of the Act, 33 U.S.C. § 1342.

15         15.     The term "discharge of pollutants" means "any addition of any pollutant to

16 navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include,

17 among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand

18 discharged into water. 33 U.S.C. § 1362(6).

19         16.     A "point source" is defined as "any discernible, confined and discrete conveyance,

20 including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants

21 are or may be discharged." 33 U.S.C. § 1362(14).

22         17.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

23 Waters of the United States includes, among others things, waters that are, were, or are susceptible

24 to use in interstate commerce, and tributaries to such waters. 40 C.F.R. § 230.3 (2015).

25         18.     Section 402(p) of the Act establishes a framework for regulating municipal and

26 industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically,

27 requires an NPDES permit for storm water discharges associated with industrial activity. *Id.* §

28 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     Mad River is degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have placed the river on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Water Quality Control Plan for the North Coast Basin (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as lead, copper, zinc and aluminum.

22.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to Mad River, and includes limits for several toxic metals, including lead, copper and zinc.

**C.      California's General Industrial Storm Water Permit**

23.      Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

24.      Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

25.      The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.      Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

27.      Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.      In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.      The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

30.      Discharge Prohibition III.B of the General Permit prohibits the direct or indirect

discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code. Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

31.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil & Grease – 15 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron – 1.00 mg/L; and Nitrate plus Nitrite Nitrogen – 0.68 mg/L.

33.     The Regional Board has established water quality standards for Mad River in the Basin Plan.

34.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." III-8.01, Basin Plan.

35.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife." III-3.00 Basin Plan.

36.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of

1  the maximum contaminant levels (MCLs)." *Id.*

2  37.  EPA issued the CTR in 2000, establishing numeric receiving water limits for

3  certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR

4  establishes the following applicable numeric limit for freshwater surface waters:  zinc – 0.12 mg/L

5  (maximum concentration), subject to water hardness.

6  38.  The General Permit requires dischargers to develop and implement a site-specific

7  SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the

8  facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a

9  description of potential pollution sources; (5) an assessment of potential pollutant sources; (6)

10  minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an

11  annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially

12  prepared and the date of each SWPPP amendment, if applicable.

13  39.  Dischargers must revise their SWPPP whenever necessary and certify and submit

14  via the Regional Board's Storm Water Multiple Application and Report Tracking System

15  ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s);

16  and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the

17  reporting year for any non-significant revisions.  General Permit, Section X.B.

18  40.  Dischargers must implement the minimum BMPs identified in Section X.H.1. of

19  the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs

20  must be implemented if necessary to reduce or prevent discharges of pollutants in storm water

21  dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

22  41.  Special Conditions Section XX.B of the General Permit require a discharger to

23  prepare and submit documentation to the Regional Board upon determination that storm water

24  discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must

25  describe changes the discharger will make to its current BMPs in order to prevent or reduce any

26  pollutant in its storm water discharges that is causing or contributing to an exceedance of water

27  quality standards.  General Permit, Section XX.B.

28  42.  Section XV of the General Permit requires an annual evaluation of storm water

1  controls including the preparation of an evaluation report and implementation of any additional

2  measures in the SWPPP to respond to the monitoring results and other inspection activities within 90

3  days of the annual evaluation.

4  43.     The General Permit requires dischargers to eliminate all non-storm water

5  discharges to storm water conveyance systems other than those specifically set forth in Section IV of

6  the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

7  44.     The General Permit requires dischargers to implement a Monitoring

8  Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers

9  must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must

10  then conduct monthly visual observations of each drainage area, as well as visual observations

11  during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also

12  collect and analyze storm water samples from two (2) storm events within the first half of each

13  reporting year (July 1 to December 31) and two (2) storm events during the second half of each

14  reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires

15  dischargers to sample and analyze during the wet season for basic parameters such as pH, total

16  suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any

17  other pollutants likely to be in the storm water discharged from the facility base on the pollutant

18  source assessment.  General Permit, Section XI.B.6.

19  45.     Dischargers must submit all sampling and analytical results via SMARTS within

20  thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results

21  must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of

22  the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the

23  average of the results for a parameter for all samples taken within a reporting year exceeds the

24  annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs

25  when two (2) or more results from samples taken for any single parameter within a reporting year

26  exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger

27  has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status

28  under the General Permit and the discharger must comply with the requirements set forth for Level 1

status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

46.     Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance. General Permit, Section XVI.

**V.      STATEMENT OF FACTS**

47.     Industrial activities occur throughout the Facility.  CATs' investigation into the industrial activities at Defendant's approximately 24-acre facility indicates that the Facility produces ready mixed concrete; stockpiles, loads and transports aggregate products; uses, maintains and parks heavy equipment; rinses and washes concrete delivery vehicles; transfers bulk fuel; fuels vehicles and heavy equipment; transfers and uses mechanical lubricant products; stockpiles and loads concrete rubble; produces precast concrete products; and stores and uses concrete admixture products.

48.     Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

49.     The Facility falls under Standard Industrial Classification ("SIC") Codes 1442 - ("Construction Sand and Gravel"); 3273 – ("Ready-Mixed Concrete"); and, 3272 – ("Concrete Products, Except Block and Brick").

50.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the

Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

51.     During rain events, storm water laden with pollutants discharges from the Facility's storm water conveyances into the Mad River, which flows to the Pacific Ocean near McKinleyville, California.

52.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

53.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of significantly contaminated storm water.

54.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

55.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

56.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

57.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

64.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

66.     Plaintiff is informed and believes, and thereupon alleges, that since at least July 6, 2015[1], Defendants have been discharging polluted storm water from the Facility into the Mad River and ultimately the Pacific Ocean, in violation of the General Permit.

67.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into the Mad River.

68.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

69.     Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

70.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

71.     Plaintiff is informed and believes, and thereupon alleges, that every day since July 6, 2015, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

---

[1] The five-year statute of limitations is tolled 60 days before filing of the complaint, to accommodate the statutorily-mandated 60-day notice period.  *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524 (9th Cir. 1987).

72.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since July 6, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

73.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

74.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

75.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

76.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

77.     Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since July 6, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

78.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

79.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

80.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, iron, and nitrate plus nitrite nitrogen in violation of Effluent Limitation D.32 of the General Permit.

81.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

82.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

83.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least July 6, 2015.  Defendants are subject to civil penalties for each and every violation of the Act since July 6, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FOURTH CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

84.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

85.     Section X.I and Section XI.A-D of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of

1    industrial activities.

2    86.    Defendants have failed to develop and implement an adequate monitoring

3    implementation plan for the Facility.  Defendants' ongoing failures to develop and implement

4    adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to

5    collect and analyze storm water samples from all discharge locations, and their continuing failure to

6    analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges

7    in significant quantities and other pollutants, as the General Permit requires.

8    87.    Defendants have failed to develop and implement an adequate monitoring and

9    reporting program for the Facility every day since at least July 6, 2015.  These violations are ongoing

10   and continuous.

11   88.     Each day of violation of the General Permit is a separate and distinct violation of

12   Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and

13   every violation of the Act since July 6, 2015.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4

14   (2008).

15

16   **VII.   RELIEF REQUESTED**

17      Wherefore, CATs respectfully requests that this Court grant the following relief:

18         a.   Declare Defendants to have violated and to be in violation of CWA section 301(a),

19   33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued

20   pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and

21   procedural requirements of the General Permit and the CWA as alleged herein;

22         b.   Enjoin Defendants from discharging pollutants from the Facility and to the

23   surface waters surrounding and downstream from the Facility in violation of the Act and the

24   General Permit;

25         c.   Enjoin Defendants from further violating the substantive and procedural

26   requirements of the General Permit;

27         d.   Order Defendants to pay civil penalties of $55,800 per day per violation for all

28   violations occurring after July 6, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C.

1    §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

2              e.   Order Defendants to take appropriate actions to restore the quality of navigable

3    waters impaired by their activities;

4              f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and

5    consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

6              g.   Award any such other and further relief as this Court may deem appropriate.

7    Dated: September 4, 2020                    Respectfully Submitted,

8                                                LAW OFFICES OF ANDREW L. PACKARD

9

10                                       By:    /s/ William N. Carlon

11                                              William N. Carlon
                                                Attorneys for Plaintiff
12                                              CALIFORNIANS FOR
                                                ALTERNATIVES TO TOXICS

**EXHIBIT A**