ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>EUREKA READY MIX LLC, DOING BUSINESS AS EUREKA READY MIX CONCRETE COMPANY, INC., ROBERT MCLAUGHLIN, AND MICHAEL MCLAUGHLIN,<br><br>Defendants. | Case No. 1:20-CV-06300-RS<br><br>**CONSENT DECREE**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)** |

**WHEREAS**, Plaintiff Californians for Alternatives to Toxics (hereinafter "CATs") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendants EUREKA READY MIX LLC, EUREKA READY MIX CONCRETE COMPANY, INC., ROBERT MCLAUGHLIN and MICHAEL MCLAUGHLIN (collectively hereinafter "Defendants") own and/or operate an approximately 24-acre facility on Boyd Road in Arcata, California (hereinafter referred to as the "Facility");

**WHEREAS**, Defendants' primary industrial activities at the Facility include, but are not limited to, producing ready mixed concrete; stockpiling, loading and transporting aggregate products; using, maintaining and parking heavy equipment; rinsing and washing concrete delivery vehicles;

transferring bulk fuel and fueling vehicles and heavy equipment; transferring and using mechanical lubricant products; stockpiling and loading of concrete rubble; producing precast concrete products; and, storing and using concrete admixture products;

**WHEREAS,** a site map of the Facility is attached hereto as **Exhibit A**, and incorporated herein by reference;

**WHEREAS,** CATs and Defendants collectively shall be referred to as the "Parties;"

**WHEREAS**, the Defendants' Facility collects and discharges storm water to the Mad River;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. §1342(p), (hereinafter "General Permit") and, prior to July 1, 2015, were regulated by Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order 92-12-DWQ and 97-03-DWQ;

**WHEREAS**, on or about June 29, 2020 Plaintiff provided notice of Defendants' violations of the Act ("Clean Water Act Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CATS' Clean Water Act Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, Defendants deny the occurrence of the violations alleged in the Clean Water Act Notice Letter and maintain that they have complied at all times with the provisions of the General Permit and the Clean Water Act;

**WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter as to all entities and persons named in the Clean Water Act Notice Letter without litigation and enter into this Consent Decree ("Decree");

**WHEREAS**, on or about September 4, 2020, CATS filed a complaint against Defendants in

the United States District Court, Northern District of California (this matter is hereinafter referred to as "the Action");

**WHEREAS**, the parties agree that Defendants entering into this Decree is not any admission of liability or non-compliance by Defendants regarding the claims made by Plaintiff in the Action, and compliance with this Decree shall not be deemed to be compliance with the General Permit or the Clean Water Act;

**WHEREAS**, within five (5) calendar days of mutual execution, this Decree shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

**AND WHEREAS**, within ten (10) calendar days of expiration of the statutory review period, or the earlier receipt of non-objection from the United States Department of Justice, Plaintiff shall file with the Court a Stipulation and Proposed Order that shall provide that the Clean Water Act claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Decree as provided herein (the date of entry of the Order to dismiss the Clean Water Act claims shall be referred to herein as the "Court Entry Date").

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

For the purposes of this Consent Decree, the Parties agree that:

(a) the Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

(b) venue is appropriate in the United States District Court for the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District;

(c) the Complaint states claims upon which relief may be granted against Defendants pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365;

(d) Plaintiff has standing to bring this action; and,

(e) the Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

## I. COMMITMENTS OF DEFENDANTS

1. **Compliance with General Permit and the Clean Water Act.** Throughout the term of this Decree, Defendants shall comply with all the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

2. **Implementation of Specific Storm Water Best Management Practices.** Unless otherwise indicated below, on or before **April 1, 2021**, Defendants shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following storm water source control measures and Best Management Practices ("BMPs") at the Facility:

(a) ***Mandatory Minimum Best Management Practices***. Defendants shall implement all mandatory minimum BMPs set forth in Section X.H of the General Permit, including but not limited to Section X.H.1.a.vii, which the Parties understand to require all dischargers to "prevent disposal of any rinse/wash waters or industrial materials into the storm water conveyance system" as part of their mandatory minimum BMPs;

(b) ***Elimination of All Unauthorized Non-Storm Water Discharges from the Facility.*** Defendants shall eliminate all unauthorized Non-Storm Water Discharges, as defined in the General Permit, from the Facility.

(c) ***Construction and Maintenance of Infiltration Basin at Northern Property Boundary***. On or before **June 30, 2021**, Defendants shall construct an infiltration basin on the northern property boundary in the location shown in the mapping and calculations for sizing the basin attached as **Exhibit C** hereto. The basin shall be sized to accept stormwater volumes that meet or exceed the design storm standards set forth in Section X.H.6 of the General Permit and shall conform

to the design specifications in the January 28, 2021 letter. At all times during the term of this Consent Decree, Defendants shall ensure that the infiltration basin is routinely monitored and maintained to ensure that it functions in accord with the calculations set forth in **Exhibit C**.

(d) ***Improvements to Concrete Washout Area.*** On or before **June 30, 2021**, Defendants shall construct a perimeter concrete berm or wall around the Concrete Wash Area, as shown on **Exhibit D**, hereto. The berm or wall shall be a minimum of 12 inches in height, sealed along the bottom and between segments, permanently attached to the Facility surface, not subject to movement by vehicles or equipment, and sufficient to eliminate and prevent future commingling of concrete washout water with storm water at the Facility. To ensure that adequate freeboard exists at all times, ERM shall perform weekly visual monitoring of the Concrete Washout Area from October 1 - May 31 of each calendar year. This monitoring shall be logged in a manner identifying the date, time and personnel doing the monitoring, together with weather conditions at the time of monitoring and any anticipated storms. This monitoring log shall be maintained and incorporated as part of the Facility SWPPP for the term of this Decree.

(e) **Precast Concrete Area Containment**. The Precast Concrete Containment Area, where concrete is poured into forms to make precast Ecoblocks, shall be visually inspected on a weekly basis between October 1 - May 31 of each calendar year. Excess concrete shall be relocated to the concrete rubble disposal area and powder spills shall be swept up with a shovel and broom. This monitoring shall be logged in a manner identifying the date, time and personnel doing the monitoring, together with weather conditions at the time of monitoring and any anticipated storms. This monitoring log shall be maintained and incorporated as part of the Facility SWPPP for the term of this Decree.

(f) ***BMP Improvements to Facility Fueling Area.*** On or before **May 1, 2021,** Defendants agree to make the following improvements to the Facility Fueling Area, as identified on **Exhibit E** hereto: (1) the entire Facility Fueling Area shall be delineated with pavement stripes (i.e. painted boundaries) indicating where all Facility fueling is required to occur, both under the express terms of the revised SWPPP, and as per signage to be installed in the Facility Fueling Area notifying

all personnel that fueling is not permitted elsewhere; and (2) the Facility Fueling Area, as delineated, shall be provided a minimum 4-inch concrete perimeter berm to prevent discharges to the surrounding Facility area. Also, by May 1, 2021, Defendants shall provide Plaintiffs with a declaration signed under penalty of perjury confirming that all Above-ground Storage Tanks ("ASTs") containing petroleum substances have secondary containment meeting the requirements of 40 CFR § 112.8(c)(2).

(g) ***Improved Source Control BMPs at Return Concrete Rubble Disposal Area***. On or before **May 1, 2021,** Defendants agree to make the following improvements to the Facility's Return Concrete Rubble Disposal Area ("RCRDA") as identified on **Exhibit F** hereto: (1) the entire RCRDA, including a delineated area in front of the open entrance shall be provided comprehensive overhead coverage sufficient to prevent wind-blown precipitation from falling on the Concrete Rubble or in the RCRDA or the delineated entrance area in front; (2) the Facility SWPPP shall be modified to require a 6-foot setback from the dripline edge of the extended roof to the location where rubble may be placed inside the structure; and, (3) an impermeable concrete block barrier shall be constructed between the open entrance of the structure and the northern Facility boundary to eliminate any potential sediment discharges in this Facility area. See **Exhibit F.**

(h) ***Changes to Monitoring Implementation Plan.*** The Parties have differing views on the legal sufficiency of the Pollutant Source Assessment conducted by Defendants and the General Permit's sampling requirements for the Facility. Without admitting liability, Defendants agree to revise their Monitoring Implementation Plan to include Aluminum, as per **Exhibit G**.

(i) ***Improved Facility Mapping.*** On or before **May 1, 2021**, and again on October 1, 2021, Defendants shall revise the Site Map appended to the current SWPPP to comply with all of the requirements in Section X.E.1-3 of the General Permit and for use in documenting this Decree, including all property boundaries, storm water discharge locations and structural BMPs implemented as of May 1, 2021 (and later, as of October 2, 2021). These revisions shall include removing the designation of "gravel-filled infiltration basin", identify the River Access Road as a Facility discharge point, extend the Facility mapping to include the area to the northeast of the Miscellaneous Storage area and use updated base aerial imagery to include the specific location of the infiltration basin

referenced in I.2.(c), above.

(j) ***Elimination of All Run-on from Adjacent Facility.*** On or before **May 1, 2021**, Defendants, shall take measure to ensure that all storm water run-on from the Trinity Diesel facility adjacent to the northeast of the Facility is eliminated.

(k) ***Increased Employee Training.*** Defendants shall increase training for the Facility's Storm Water Pollution Prevention Team ("SWPPT"), including holding one training meeting in January and one training meeting in October of each year. Defendants will incorporate the holding of these twice-annual meetings in its new SWPPP. Defendants shall target training on tracking what storm events qualify for sampling purposes, undertaking visual monitoring, and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State's on-line reporting system ("SMARTS"). Defendants shall log these meetings with the date, materials covered, written agenda, and a list of attendees for each, and shall retain these logs with the Facility's SWPPP. Defendants shall have at least one member of the SWPPT, that meets the certification qualifications, be formally certified as a Qualified Industrial Storm Water Practitioner ("QISP");

(l) ***Rain Data.*** Defendants shall install and maintains a fully automated rain gauge at the Facilities; the Parties may also use publicly-available rain data to resolve any disputes under this Decree.

**3. SWPPP Amendments.** On or before **May 1, 2021** and again on October 1, 2021, Defendants shall amend the Facility SWPPPs to incorporate all of the relevant requirements of this Decree and the General Permit. These revisions shall reflect all then-current site conditions and practices and identify potential contaminants of concern, identify the location of all pervious and impervious areas, sediment basins, drop inlets, surface and sub-surface conveyances, structural BMPs, and storm water flow vectors. These revisions shall also provide for the preparation and maintenance of all records (visual observations, training, etc.) required by the General Permit and this Consent Decree; monitoring and maintenance of all Facility collection and discharge points during the Wet Season as required by the General Permit; and the twice-annual storm water management training for Facility employees referenced above.

4. **Sampling Frequency.** For the 2021-2022 and 2022-2023 reporting years ending June 30th (2022 and 2023), Defendants shall collect and analyze samples from the Facility from three (3) Qualifying Storm Events[1] ("QSEs") within the first half of each reporting year (July 1 to December 31), and three (3) QSEs within the second half of each reporting year (January 1 to June 30), to the extent possible in light of the Facility's enhanced discharge-reduction BMPs. The storm water sample results shall be compared with the values set forth in **Exhibit G**, attached hereto, and incorporated herein by reference. If the results of any such samples exceed the parameter values set forth in **Exhibit G**, Defendants shall comply with the "Action Memorandum" requirements set forth below. All sample results obtained pursuant to this decree shall be uploaded to the State Board's SMARTS database

5. **Sampling Parameters.** All six (6) samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit G**, including TMDLs, as applicable, by a laboratory accredited by the State of California. All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded. Analytical methods used by the laboratory shall comply with General Permit requirements in regards to both test method and detection limit. See General Permit, Table 2, at 43. Pursuant to the Communications provision below (Section 8) sampling results shall be provided to CATs contemporaneously with Defendant's submission(s) to the SMARTS database.

6. **"Action Memorandum" Trigger; CATs Review Of "Action Memorandum"; Meet-and-Confer.** If any sample taken during the two (2) reporting years referenced in Paragraph 4 above exceeds the Evaluation Levels set forth in **Exhibit G**, or if Defendants fail or lack the ability to collect and analyze samples from six (6) QSEs, then Defendants shall prepare a written statement discussing the exceedance(s) and/or failure and/or inability to collect and analyze samples from six (6)

---

[1] A Qualifying Storm Event (QSE) is defined in the General Permit as a precipitation event that: (a) produces a discharge from at least one drainage area; and (b) is preceded by 48 hours with no discharge from any drainage area. *See* General Permit, Section XI(b)(1).

storm events, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples ("Action Memorandum").

The Action Memorandum shall be provided to CATs not later than August 1 following the conclusion of each reporting year, on August 1, 2022 and August 1, 2023. Such additional measures may include, but are not limited to, further material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility. Such additional measures, to the extent feasible, shall be implemented immediately and in no event later than sixty (60) days after the due date of the Action Memorandum. Within thirty (30) days of implementation, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum. CATs may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate; however, CATs' failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum. Upon request by CATs, Defendants agree to meet and confer in good faith (at the Facility, if requested by Plaintiff) regarding the contents and sufficiency of the Action Memorandum.

7. **Inspections During the Term of This Decree.** In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Memorandum as set forth above, Defendants shall permit representatives of CATs to perform up to three (3) physical inspections of the Facility during the term of this Decree. These inspections shall be performed by CATs' counsel and consultants and may include sampling, photographing, and/or videotaping and CATs shall provide Defendants with a copy of all sampling reports, photographs and/or video. CATs shall provide at least seventy-two (72) hours advance notice of such physical inspection, except that Defendants shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, Defendants shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CATS may proceed.

Defendants shall not make any alterations to Facility conditions during the period between receiving CATs' initial seventy-two (72) hour advance notice and the start of CATs' inspection that Defendants would not otherwise have made but for receiving notice of CATs' request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations. Nothing herein shall be construed to prevent Defendants from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CATs or at any time.

8. **Communications To/From Regional and State Water Boards.** During the term of this Decree, Defendants shall provide CATs with courtesy copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facilities, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the current General Permit. Such documents and reports shall be provided to CATs via email pursuant to the Notice provisions set forth below and contemporaneously with Defendant's submission(s) to, or, receipt from, such agencies.

9. **SWPPP Amendments.** Pursuant to the Notice provisions set forth below, Defendants shall provide CATs with a copy of any amendments to the Facility SWPPP made during the term of the Decree within fourteen (14) days of such amendment.

## II. MITIGATION, COMPLIANCE MONITORING, AND FEES AND COSTS

10. **Mitigation Payment In Lieu Of Civil Penalties Under the Clean Water Act.** As mitigation to address any potential harms from the Clean Water Act violations alleged in the Action, Defendants agree to pay the sum of $75,000 to California Trout, for projects to improve water quality in the Mad River watershed. Such mitigation payment shall be remitted directly to California Trout at: California Trout, Attn: Alan Roesberry, 360 Pine Street, 4th Floor, San Francisco, CA 94104, within ten (10) days after the Court Entry Date.

11. **Compliance Monitoring Funding.** To defray CATs' reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendants' compliance with this Decree, Defendants agree to pay the sum of $15,000 to a compliance monitoring fund maintained by counsel for CATs as described below. Payment shall be made payable to the "Law

Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel at the Notice address provided herein within ten (10) days after the Court Entry Date. Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, and discussions with Defendant concerning the ERA reporting requirements of the General Permit. Compliance monitoring funds shall not be used to pay attorneys' fees and costs associated with negotiating any amendments to this Decree; the recovery of any such fees or costs shall be addressed in the amendment to this Decree.

**12. Reimbursement of Fees & Costs.** Defendants agree to reimburse CATs in the amount of $65,000 to defray CATs' reasonable investigative, expert, consultant, and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the action, and negotiating a resolution of this action in the public interest. Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel at the Notice address provided herein within ten (10) days after the Court Entry Date.

## III. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

**13.** If a dispute under this Decree arises, or either Party believes that a breach of this Decree has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the United States District Court of California, Northern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Decree. The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act

and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provision.

**14.** **CATs' Waiver and Release.** Upon the Court Entry Date of this Decree, CATs, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims arising from or pertaining to the Notice Letters, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation (excluding all fees of attorneys, experts, and others, and costs per Section II above), or any other sum incurred or claimed or which could have been claimed under the Clean Water Act in this Action, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility, up to the Court Entry Date.

**15.** **Defendants' Waiver and Release.** Defendants, on their own behalf and on behalf of any Released Defendant Party under its control, release CATs (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

## IV. MISCELLANEOUS PROVISIONS

**16.** The Parties enter into this Decree for the purpose of avoiding prolonged and costly litigation of the Clean Water Act claims in the Action. Nothing in this Decree shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, or non-compliance with the General Permit or the Clean Water Act, nor shall compliance with this Decree constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law, nor deemed to be compliance with the General

Permit or the Clean Water Act. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Decree.

**17.** The Decree shall be effective upon mutual execution by all Parties. The Decree shall terminate on the "Termination Date," which shall be **October 1, 2023**.

**18.** The Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Decree shall be valid as an original.

**19.** In the event that any one of the provisions of this Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

**20.** The language in all parts of this Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Decree shall be construed pursuant to the law of the United Sates, without regard to choice of law principles.

**21.** The undersigned are authorized to execute this Decree on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Decree.

**22.** All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Decree are contained herein. This Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Decree, unless otherwise expressly provided for therein.

**23.** **Notices.** Any notices or documents required or provided for by this Decree or related thereto that are to be provided to CATs pursuant to this Decree shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
600 F Street, Suite 3
Arcata, California 95521
Tel. (707) 834-4833
E-mail: patty@alt2tox.org

With copies sent to:

Andrew L. Packard
William Carlon
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, California 94952
Tel: (707) 782-4060
E-mail: andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Any notices or documents required or provided for by this Decree or related thereto that are to be provided to Defendants pursuant to this Decree shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Robert McLaughlin
Michael McLaughlin
Eureka Ready Mix LLC
Arcata, CA 95521
Tel: (707) 633-6278
robm@eurekareadymix.com

With copies sent to:

Sean Hungerford
Harrison, Temblador, et al.
2801 T Street
Sacramento CA 95816
Tel: (916) 706-2845
HYPERLINK "mailto:shungerford@hthjlaw.com"shungerford@hthjlaw.com

Daniel E. Cooper
Morrison, Morrison & Cooper
611 I Street, Ste. A
Eureka, CA 95501
Tel: (707) 443-8011
danielcooperlaw@gmail.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

**24.** Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

**25.** If for any reason the Court should decline to approve this Decree in the form presented, the Parties shall use their best efforts to work together to modify the Decree within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Decree in a mutually acceptable manner, this Decree shall become null and void.

26. This Decree shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

27. This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives. Any amendments to this Decree shall be subject to the United States Department of Justice's 45-day statutory review as set forth in 33 U.S.C. § 1365(c).

The Parties hereto enter into this Decree and respectfully submit it to the Court for its entry.

APPROVED AS TO CONENT:

Dated: March 31, 2021

CALIFORNIANS FOR ALTERNATIVES TO TOXICS

By: ______________________
Patricia Clary, Executive Director

Dated: ______________, 2021

EUREKA READY MIX LLC,
EUREKA READY MIX CONCRETE COMPANY, INC.,

By: ______________________
Robert McLaughlin, Owner

Dated: ______________, 2021

ROBERT MCLAUGHLIN

By: ______________________
Robert McLaughlin

**26.** This Decree shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

**27.** This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives. Any amendments to this Decree shall be subject to the United States Department of Justice's 45-day statutory review as set forth in 33 U.S.C. § 1365(c).

The Parties hereto enter into this Decree and respectfully submit it to the Court for its entry.

APPROVED AS TO CONENT:

Dated: ________________, 2021

CALIFORNIANS FOR ALTERNATIVES TO TOXICS

By: ______________________________
Patricia Clary, Executive Director

Dated: 3-31, 2021

EUREKA READY MIX LLC,
EUREKA READY MIX CONCRETE COMPANY, INC.,

By: [signature]
Robert McLaughlin, Owner

Dated: 3-31, 2021

ROBERT MCLAUGHLIN

By: [signature]
Robert McLaughlin

Dated: 3/31, 2021

MICHAEL MCLAUGHLIN

By: Michael McLaughlin

APPROVED AS TO FORM:

Dated: 3/31, 2021

LAW OFFICES OF ANDREW L. PACKARD

By: Andrew L. Packard
Attorneys for Plaintiff
CALIFORNIANS FOR ALTERNATIVES TO TOXICS

Dated: 3/31, 2021

Morrison, Morrison & Cooper

By: Daniel E. Cooper
Attorney for Defendants
EUREKA READY MIX LLC, EUREKA READY MIX CONCRETE COMPANY, INC., ROBERT MCLAUGHLIN, AND MICHAEL MCLAUGHLIN

Good cause appearing, **IT IS SO ORDERED.**

Dated: May 27, 2021

By: Hon. Richard Seeborg
Unites Stated District Court
Northern District of California

**EXHIBIT A – Facility Site Map**
**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**
**EXHIBIT C – Sediment Basin Drawings**
**EXHIBIT D – Concrete Washout Area Drawings**
**EXHIBIT E – Facility Fueling Area Drawings**
**EXHIBIT F – Return Concrete Rubble Disposal Area Drawings**
**EXHIBIT G – Testing Parameters**

**EXHIBIT A – Facility Site Map**


PIPE
AREA
N BASIN
ASIN
LE
MAD RIVER
RIVER ACCESS ROAD
MISC. STORAGE
OBSERVATION POINT B1E
COVERED RETURN CONCRETE RUBBLE DISPOSAL AREA
DP B2W
2' CONC. WALL
CONCRETE WASHOUT
ADMIX TANKS
CONCRETE BATCH PLANT
PRECAST CONCRETE CONTAINMENT
COVERED FUELING AREA
DMA 2
OFFICE
SCALES
SHOP
OFFICE
PARKING
NO STORMWATER ENTERS CANAL FROM ERM
PARKING
CONCRETE CANAL
NO CO-MINGLING OF STORMWATER,
ALL RUN-ON FROM SOUTH
N
100'
= 100'±

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

LAW OFFICES OF
ANDREW L. PACKARD
100 PETALUMA BLVD N, STE 301, PETALUMA, CA 94952
PHONE (707) 763-7227 FAX (707) 763-9227
INFO@PACKARDLAWOFFICES.COM

June 29, 2020

**VIA CERTIFIED MAIL**

Robert McLaughlin, Managing Member
Eureka Ready Mix LLC
4945 Boyd Road
Arcata, CA 95221

Daniel Cooper, Agent for Service of Process
Eureka Ready Mix LLC
611 I Street, Suite A
Eureka, CA 95501

Michael McLaughlin, Legally Responsible Person
Eureka Ready Mix Concrete Company, Inc.
4945 Boyd Road
Arcata, CA 95521

**Re: NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Robert McLaughlin, Mr. Michael McLaughlin, and Mr. Daniel Cooper:

This firm represents Californians for Alternatives to Toxics ("CATs") in regard to violations of the Clean Water Act ("the Act") occurring at Eureka Ready Mix LLC's Arcata facility located at 4945 Boyd Road, in Arcata, California (the "Facility"). This letter is being sent to you as the responsible owners, officers and/or operators of the Facility, or as the registered agent for this entity. Unless otherwise noted, Eureka Ready Mix LLC, Eureka Ready Mix Concrete Company, Inc., Mr. Robert McLaughlin, and Mr. Michael McLaughlin shall hereinafter be collectively referred to as "Eureka Ready Mix." The purpose of this letter is to provide Eureka Ready Mix with notice of the violations of California's Industrial General Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water associated with industrial activities from the Facility into local surface waters.

Eureka Ready Mix is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 92-12-DWQ, Order No. 97-03-DWQ, and Order 2014-0057-DWQ ("General Permit" or "Permit").[1]

---

[1] Eureka Ready Mix submitted a Notice of Intent (NOI) to comply with the General Permit for the Facility on or about September 18, 2015.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Eureka Ready Mix to a penalty of up to $55,800 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against Eureka Ready Mix for violations of the Clean Water Act and the Permit.

## I. Background.

### A. Californians for Alternatives to Toxics

CATs is a non-profit corporation dedicated to the defense of the environment from the effects of toxic chemicals, and the preservation and protection of the wildlife and natural resources of California waters, including the waters into which Eureka Ready Mix discharges polluted storm water. Members of CATs enjoy the waters that the Facility discharges into, including the Mad River and the Pacific Ocean. Members of CATs use and enjoy these waters for their commercial and recreational fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses. The discharge of pollutants from the Facility impairs each of these uses. Further, discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of CATs's members have been, are being, and will continue to be adversely affected by Eureka Ready Mix's failure to comply with the Clean Water Act and the General Permit.

### B. The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832,

840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342

### C. California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CATs refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For purposes of this notice letter, CATs refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.* Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and, (3) self-monitoring and reporting requirements.

### D. Eureka Ready Mix's Arcata Facility

Eureka Ready Mix's primary industrial activities at the approximately 24-acre Facility include producing ready mixed concrete; stockpiling, loading and transporting aggregate products; using, maintaining and parking heavy equipment; rinsing and washing concrete delivery vehicles; transferring bulk fuel and fueling vehicles and heavy equipment; transferring and using mechanical lubricant products; stockpiling and loading of concrete rubble; producing precast concrete products; and, storing and using concrete admixture products. The industrial

activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 1442 – "Construction Sand and Gravel;" 3273 – "Ready-Mixed Concrete;" and, 3272 – "Concrete Products, Except Block and Brick."

Eureka Ready Mix collects and discharges storm water associated with industrial activities at the Facility through at least two discharge points into the Mad River, which ultimately flows into the Pacific Ocean. The Mad River and the Pacific Ocean are waters of the United States within the meaning of the Clean Water Act.

The General Permit requires Eureka Ready Mix to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 1442 and 327X must also analyze storm water samples for Iron ("Fe") and Nitrate plus Nitrite Nitrogen ("N+N"). 1997 General Permit, Tables 1-2; 2015 General Permit Tables 1-2.

## II. Eureka Ready Mix's Violations of the Act and Permit.

Based on its review of available public documents, CATs is informed and believes that Eureka Ready Mix is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Eureka Ready Mix is subject to penalties for violations of the Act since June 29, 2015.

### A. Eureka Ready Mix Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

Eureka Ready Mix's storm water sampling results provide conclusive evidence of Eureka Ready Mix's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

#### 1. Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 1997

General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

The *Water Quality Control Plan for the North Coast Region (Revised June 2018)* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Eureka Ready Mix's storm water discharges. The Basin Plan identifies present and potential beneficial uses for the Mad River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

The State and Regional Water Boards assess California's waters every two years to determine if they contain pollutants at levels that exceed protective water quality criteria and standards as required by section 303(d) of the Clean Water Act. The State has determined that the Mad River Hydrologic Unit, Mad River is impaired for the following pollutants: aluminum, sedimentation/siltation, and temperature. Eureka Ready Mix's discharges of storm water associated with industrial activity cause or contribute to this exceedance of an applicable water quality standard, and are in violation of the General Permit.

**2. Applicable Effluent Limitations.**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Eureka Ready Mix: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; Nitrate plus Nitrite Nitrogen – 0.68 mg/L; and, Iron – 1.00 mg/L.

**3. Eureka Ready Mix's Storm Water Sample Results**

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

**a. Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/3/2015 | B2W | TSS | 300 | 100 |
| 12/18/2015 | B2W | TSS | 220 | 100 |
| 3/1/2016 | B2W | TSS | 290 | 100 |
| 4/14/2016 | B2W | TSS | 320 | 100 |
| 12/14/2016 | B2W | TSS | 160 | 100 |
| 1/18/2018 | B2W | TSS | 250 | 100 |
| 2/22/2018 | B2W | TSS | 250 | 100 |
| 4/5/2018 | B2W | TSS | 200 | 100 |
| 12/14/2018 | B2W | TSS | 170 | 100 |
| 12/24/2018 | B2W | TSS | 260 | 100 |
| 4/5/2019 | B2W | TSS | 280 | 100 |
| 12/19/2019 | B2W | TSS | 150 | 100 |

**e. Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 12/3/2015 | B2W | Fe | 48 | 1.0 |
| 12/18/2015 | B2W | Fe | 23 | 1.0 |
| 3/1/2016 | B2W | Fe | 24 | 1.0 |
| 4/14/2016 | B2W | Fe | 12 | 1.0 |
| 11/15/2016 | B2W | Fe | 2.9 | 1.0 |
| 12/14/2016 | B2W | Fe | 7.2 | 1.0 |
| 2/3/2017 | B2W | Fe | 4.7 | 1.0 |
| 4/7/2017 | B2W | Fe | 2.9 | 1.0 |
| 12/20/2017 | B2W | Fe | 5.5 | 1.0 |
| 1/18/2018 | B2W | Fe | 19 | 1.0 |
| 2/22/2018 | B2W | Fe | 21 | 1.0 |

| | | | | |
|---|---|---|---|---|
| 4/5/2018 | B2W | Fe | 15 | 1.0 |
| 12/14/2018 | B2W | Fe | 15 | 1.0 |
| 12/24/2018 | B2W | Fe | 19 | 1.0 |
| 3/27/2019 | B2W | Fe | 5.1 | 1.0 |
| 4/5/2019 | B2W | Fe | 23 | 1.0 |
| 12/19/2019 | B2W | Fe | 9.1 | 1.0 |
| 1/8/2020 | B2W | Fe | 10 | 1.0 |

**f. Discharge of Storm Water Containing Nitrate plus Nitrite Nitrogen (N+N) at Concentrations in Excess of Applicable EPA Benchmark Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 4/14/2016 | B2W | N+N | 1.029 | 0.68 |
| 11/15/2016 | B2W | N+N | 2.72 | 0.68 |
| 12/20/2017 | B2W | N+N | 2.61 | 0.68 |
| 1/18/2018 | B2W | N+N | 2.12 | 0.68 |
| 2/22/2018 | B2W | N+N | 2.51 | 0.68 |
| 4/5/2018 | B2W | N+N | 4.5 | 0.68 |

**h. Eureka Ready Mix's Sample Results Are Evidence of Violations of the General Permit**

Eureka Ready Mix’s sample results demonstrate violations of the Permit’s discharge prohibitions, receiving water limitations and effluent limitations set forth above. CATs is informed and believes that Eureka Ready Mix has known that its storm water contains pollutants at levels exceeding General Permit standards since at least June 29, 2015.

CATs alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which CATs alleges that Eureka Ready Mix has discharged storm water containing impermissible levels of TSS, Fe, and N+N in violation of the General Permit. 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

**4. Eureka Ready Mix Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit’s SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Eureka Ready Mix has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Permit, Section X.H.1(a-g).

Eureka Ready Mix has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day that Eureka Ready Mix has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Eureka Ready Mix have been in violation of the BAT and BCT requirements at the Facility every day since at least June 29, 2015.

**5. Eureka Ready Mix Has Failed to Implement an Adequate Monitoring Implementation Plan.**

The General Permit requires dischargers to implement a Monitoring Implementation Plan. General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all storm water discharge locations. General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3). General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment. General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. General Section XI.B.11. Eureka Ready Mix has failed to develop and implement an adequate Monitoring Implementation Plan. These failures include failing to sample from all discharge locations and failing to analyze each sample for all required parameters.

Each day that Eureka Ready Mix has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit. Eureka Ready Mix has been in violation of the Monitoring Implementation Plan requirements every day since at least June 29, 2015.

**6. Eureka Ready Mix Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General permit, Section A. CATs' ongoing investigation indicates that Eureka Ready Mix has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. Eureka Ready Mix has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations. Each day Eureka Ready Mix failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. Eureka Ready Mix has been in violation of these requirements at the Facility every day since at least June 29, 2015.

## III. Persons Responsible for the Violations.

CATs puts Eureka Ready Mix on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CATs puts Eureka Ready Mix on formal notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing party is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
P.O. Box 900
Eureka, CA 95502
(707) 834-4833

## V. Counsel.

CATs has retained legal counsel to represent it in this matter. Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices Of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

David Williams
Law Offices of David William
1839 Ygnacio Valley Road, Suite 351
Walnut Creek, CA 94598
(510) 847-2356
dhwill7@gmail.com

William Verick
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
(707) 630-5061
wverick@igc.org

## VI. Conclusion

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Eureka Ready Mix and their agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William N. Carlon
Law Offices of Andrew L. Packard
Counsel for Californians for Alternatives to Toxics

**SERVICE LIST**

**VIA CERTIFIED MAIL**

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

John Busterud, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

William Barr, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard Suite A
Santa Rosa, CA 95403

**Notice of Intent to File Suit, Eureka Ready Mix**
**Significant Rain Events,* 6/29/2015 – 6/29/2020**

| | | | |
|---|---|---|---|
| October 28, 2015 | October 2, 2016 | January 18, 2017 | April 14, 2017 |
| November 15, 2015 | October 3, 2016 | January 19, 2017 | April 17, 2017 |
| December 8, 2015 | October 6, 2016 | January 20, 2017 | April 18, 2017 |
| December 9, 2015 | October 14, 2016 | January 21, 2017 | April 20, 2017 |
| December 10, 2015 | October 15, 2016 | January 22, 2017 | April 24, 2017 |
| December 11, 2015 | October 16, 2016 | January 23, 2017 | April 25, 2017 |
| December 17, 2015 | October 17, 2016 | February 3, 2017 | April 26, 2017 |
| December 18, 2015 | October 18, 2016 | February 4, 2017 | April 27, 2017 |
| December 22, 2015 | October 25, 2016 | February 5, 2017 | May 12, 2017 |
| January 19, 2016 | October 26, 2016 | February 6, 2017 | May 17, 2017 |
| January 22, 2016 | October 27, 2016 | February 7, 2017 | June 8, 2017 |
| January 28, 2016 | October 28, 2016 | February 9, 2017 | June 10, 2017 |
| January 29, 2016 | October 30, 2016 | February 10, 2017 | June 11, 2017 |
| January 30, 2016 | October 31, 2016 | February 16, 2017 | August 10, 2017 |
| February 4, 2016 | November 1, 2016 | February 18, 2017 | September 18, 2017 |
| February 13, 2016 | November 6, 2016 | February 19, 2017 | September 20, 2017 |
| February 18, 2016 | November 12, 2016 | February 20, 2017 | October 20, 2017 |
| February 19, 2016 | November 15, 2016 | February 21, 2017 | November 3, 2017 |
| February 20, 2016 | November 16, 2016 | February 22, 2017 | November 4, 2017 |
| February 22, 2016 | November 20, 2016 | February 23, 2017 | November 9, 2017 |
| February 27, 2016 | November 21, 2016 | February 25, 2017 | November 10, 2017 |
| February 28, 2016 | November 23, 2016 | February 27, 2017 | November 11, 2017 |
| March 2, 2016 | November 25, 2016 | February 28, 2017 | November 13, 2017 |
| March 3, 2016 | November 26, 2016 | March 4, 2017 | November 14, 2017 |
| March 9, 2016 | November 27, 2016 | March 5, 2017 | November 16, 2017 |
| March 10, 2016 | November 28, 2016 | March 6, 2017 | November 17, 2017 |
| March 11, 2016 | November 30, 2016 | March 7, 2017 | November 20, 2017 |
| March 12, 2016 | December 6, 2016 | March 8, 2017 | November 21, 2017 |
| March 20, 2016 | December 7, 2016 | March 9, 2017 | November 23, 2017 |
| March 21, 2016 | December 8, 2016 | March 16, 2017 | November 24, 2017 |
| March 22, 2016 | December 9, 2016 | March 19, 2017 | November 26, 2017 |
| March 27, 2016 | December 10, 2016 | March 20, 2017 | November 27, 2017 |
| April 4, 2016 | December 14, 2016 | March 21, 2017 | November 29, 2017 |
| April 9, 2016 | December 15, 2016 | March 22, 2017 | December 20, 2017 |
| April 14, 2016 | December 23, 2016 | March 24, 2017 | December 30, 2017 |
| April 15, 2016 | December 24, 2016 | March 25, 2017 | January 4, 2018 |
| April 22, 2016 | January 2, 2017 | March 26, 2017 | January 5, 2018 |
| April 23, 2016 | January 3, 2017 | March 27, 2017 | January 6, 2018 |
| April 24, 2016 | January 4, 2017 | March 30, 2017 | January 8, 2018 |
| April 27, 2016 | January 7, 2017 | April 7, 2017 | January 9, 2018 |
| April 28, 2016 | January 8, 2017 | April 8, 2017 | January 10, 2018 |
| April 29, 2016 | January 9, 2017 | April 10, 2017 | January 11, 2018 |
| May 21, 2016 | January 10, 2017 | April 11, 2017 | January 12, 2018 |
| July 9, 2016 | January 11, 2017 | April 12, 2017 | January 16, 2018 |
| July 10, 2016 | January 12, 2017 | April 13, 2017 | January 18, 2018 |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Eureka Ready Mix**
**Significant Rain Events,* 6/29/2015 – 6/29/2020**

January 19, 2018
January 20, 2018
January 22, 2018
January 24, 2018
January 25, 2018
January 26, 2018
February 12, 2018
February 18, 2018
February 19, 2018
February 22, 2018
February 23, 2018
February 25, 2018
February 26, 2018
March 1, 2018
March 2, 2018
March 3, 2018
March 4, 2018
March 13, 2018
March 15, 2018
March 16, 2018
March 17, 2018
March 22, 2018
March 24, 2018
March 25, 2018
April 6, 2018
April 7, 2018
April 10, 2018
April 12, 2018
April 16, 2018
April 28, 2018
April 29, 2018
April 30, 2018
May 9, 2018
May 26, 2018
June 9, 2018
September 30, 2018
October 2, 2018
October 6, 2018
October 28, 2018
November 22, 2018
November 23, 2018
November 24, 2018
November 27, 2018
November 28, 2018
November 29, 2018
November 30, 2018
December 1, 2018
December 2, 2018
December 8, 2018
December 10, 2018
December 12, 2018
December 15, 2018
December 17, 2018
December 19, 2018
December 21, 2018
December 24, 2018
December 25, 2018
January 6, 2019
January 7, 2019
January 9, 2019
January 17, 2019
January 18, 2019
January 19, 2019
January 20, 2019
January 21, 2019
February 2, 2019
February 3, 2019
February 4, 2019
February 9, 2019
February 10, 2019
February 11, 2019
February 13, 2019
February 14, 2019
February 15, 2019
February 16, 2019
February 17, 2019
February 20, 2019
February 21, 2019
February 24, 2019
February 25, 2019
February 26, 2019
February 27, 2019
February 28, 2019
March 2, 2019
March 6, 2019
March 7, 2019
March 10, 2019
March 12, 2019
March 22, 2019
March 23, 2019
March 25, 2019
March 26, 2019
March 27, 2019
March 28, 2019
March 29, 2019
April 3, 2019
April 5, 2019
April 6, 2019
April 8, 2019
April 9, 2019
April 16, 2019
May 16, 2019
May 17, 2019
May 19, 2019
May 21, 2019
May 22, 2019
May 26, 2019
August 10, 2019
September 16, 2019
September 18, 2019
September 19, 2019
September 30, 2019
October 17, 2019
October 19, 2019
November 19, 2019
November 27, 2019
November 28, 2019
December 1, 2019
December 3, 2019
December 7, 2019
December 8, 2019
December 11, 2019
December 12, 2019
December 13, 2019
December 14, 2019
December 15, 2019
December 19, 2019
December 22, 2019
December 23, 2019
December 25, 2019
December 30, 2019
January 1, 2020
January 2, 2020
January 4, 2020
January 8, 2020
January 9, 2020
January 11, 2020
January 12, 2020
January 13, 2020
January 14, 2020
January 15, 2020
January 16, 2020
January 17, 2020
January 21, 2020
January 24, 2020
January 25, 2020
January 26, 2020
January 27, 2020
January 28, 2020
January 30, 2020
February 2, 2020
February 3, 2020
February 16, 2020
February 17, 2020
March 7, 2020
March 14, 2020
March 15, 2020
March 17, 2020
March 18, 2020
March 24, 2020
March 25, 2020
March 30, 2020
March 31, 2020
April 1, 2020
April 4, 2020
April 5, 2020
April 6, 2020
April 23, 2020
May 3, 2020
May 12, 2020
May 13, 2020
May 14, 2020
May 15, 2020
May 17, 2020
May 18, 2020
May 19, 2020
May 30, 2020
May 31, 2020
June 7, 2020

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C – Sediment Basin Drawings**



**Phone:** (707) 441-8855 **Email:** info@shn-engr.com **Web:** shn-engr.com
812 W. Wabash Avenue, Eureka, CA 95501-2138

Reference: 016238.001

January 28, 2021

Rob McLaughlin
Eureka Ready Mix
4945 Boyd Road
Arcata, CA, 95521

**Subject: Calculations for Sizing Stormwater Runoff Reduction Feature**

Dear Rob McLaughlin:

This letter contains the calculations and assumptions to assist in sizing a stormwater runoff reduction feature for the Eureka Ready Mix (ERM) site located at 4945 Boyd Road in Arcata, California.

# Introduction

It is our understanding that ERM is seeking to construct a feature for reducing stormwater runoff from the site, specifically for the area known as Drainage Management Area (DMA) #2. A site map identifying this area is included in Appendix 1.

Based on discussions with the owner and onsite observations, runoff from DMA #2 drains to the northwest corner of the site, which is where ERM proposes to construct a feature to reduce the stormwater runoff leaving the site. It is our understanding that ERM has constructed isolated gravel infiltration areas throughout the site that have been effective; however, ERM wants to expand the infiltration feature in the northwest corner of the site to contain the volume of runoff from the entirety of DMA #2 that is associated with the 85th percentile 24-hour design storm.

# Assumptions and Sizing Criteria

To size the stormwater runoff reduction feature for the desired volume, several assumptions were required. These assumptions are summarized below.

- The runoff methodology used for estimating runoff for the site is the U.S. Department of Agriculture (USDA) Natural Resources Conservation Service (NRCS) TR-55 Method entitled "Urban Hydrology for Small Watersheds." This method considers a number of factors regarding the watershed such as ground cover material, underlying hydrologic soil group, and precipitation to obtain the runoff depth. The calculated runoff depth can then be applied over the DMA to determine the volume of runoff for the specified storm event.
- DMA #2 is estimated at 380,486 square feet (SF) in area and is composed predominantly of gravel surface cover. The surface cover has been approximated as "Gravel Streets and Roads" from Table 2.2a of the TR-55 manual.

- The underlying hydrologic soil group is unknown; therefore, type D soils were conservatively selected because they result in the largest runoff volume, compared to the other soil group types.
- It is assumed the native soils will facilitate infiltration to allow the stormwater runoff reduction feature to drain.
- Sizing of the feature assumes the stormwater volume from the design storm is contained entirely within the pore space of the gravel feature. Typical pore space for open-graded gravel is 35%.
- The design storm for this analysis is the 85th percentile 24-hour storm, which according to the Humboldt Low Impact Development Stormwater Manual, is 0.65 inches in the Humboldt Bay area.
- The cross-section of the stormwater reduction feature was assumed to be 10 feet wide and 6 feet deep.

Using the above assumptions and following the TR-55 equations, calculations were performed to determine the required length of the stormwater reduction feature needed to contain the runoff of DMA #2 that is associated with the 85th percentile 24-hour design storm. Calculations are included in Appendix 2.

# Results

According to the calculations, the required feature size to contain the runoff from DMA #2 is approximately 214 feet long by 10 feet wide by 6 feet deep. The calculation results are subject to the following considerations:

- If the cross-section dimensions, cover type, or hydrologic soil type varies from the assumptions, the sizing may require adjustment.
- The calculations are for volume sizing only and there is no design included to provide a specific level of treatment; however, settling of sediment particles and infiltration are likely to occur.
- Fine sediment accumulation within the feature may reduce storage capacity over time, requiring removal and replacement of the gravel to rehabilitate the functionality.
- Storms larger than the 85th percentile storm, or comparable intensities, may bypass the infiltration trench as soon as it is full. Additionally, since the infiltration capacity of the underlying soil is unknown, saturation from prolonged wet weather may exceed the capacity for storage and infiltration.

Please call me at 707-441-8855 if you have any questions.

Sincerely,

**SHN**




Jared O'Barr
Civil Engineering Principal

JXO:ame

Appendices:
1. Site Plan
2. Stormwater Reduction Area Sizing Calculations

# References

County of Humboldt. (2015). "Humboldt Low Impact Development Stormwater Manual." Accessed 1/27/2021 at: "http://northcoaststormwatercoalition.org/wp-content/uploads/2016/07/Humboldt-LID-Stormwater-Manual_V2.0.pdf.

USDA/NRCS. (1956). "TR-55 Urban Hydrology for Small Watersheds." Accessed 1/27/2021 at: https://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb1044171.pdf.



# Site Plan 1


PIPE
AREA
N BASIN
ASIN
LE
MISC. STORAGE
RIVER ACCESS ROAD
OBSERVATION POINT B1E
MAD RIVER
COVERED RETURN CONCRETE RUBBLE DISPOSAL AREA
DP B2W
2' CONC. WALL
CONCRETE WASHOUT
ADMIX TANKS
CONCRETE BATCH PLANT
PRECAST CONCRETE CONTAINMENT
COVERED FUELING AREA
DMA 2
OFFICE
SCALES
SHOP
OFFICE
PARKING
NO STORMWATER ENTERS CANAL FROM ERM
PARKING
CONCRETE CANAL
NO CO-MINGLING OF STORMWATER,
ALL RUN-ON FROM SOUTH
N
100'
= 100'±

# Stormwater Reduction Area Sizing Calculations

# 2



**Phone:** (707) 441-8855 **Email:** info@shn-engr.com **Web:** shn-engr.com
812 W Wabash Avenue, Eureka, CA 95501

Reference: 016238.001
Date: 1/27/2021

Calculated: PEG
Checked: JXO

**Stormwater Reduction Area Sizing**
**Eureka Ready Mix - Boyd Road**
**Arcata, California**

| | | |
|---|---|---|
| **Approximate Area of DMA #2** | 380,486 | SF |
| **85th Percentile, 24-hour Storm Depth** | 0.65 | inches |

**Infiltration Area Cross-Section**

| | | |
|---|---|---|
| **Depth** | 6 | feet |
| **Width** | 10 | feet |

**USDA NRCS TR-55 - Urban Hydrology for Small Watershed - Runoff Calculations**

| | Soil Group Type | | | |
|---|---|---|---|---|
| | A | B | C | D |
| **CN (Gravel Road)** | 76 | 85 | 89 | 91 |
| **S (Retention, inches)** | 3.16 | 1.76 | 1.24 | 0.99 |
| **P (Precipitation, inches)** | 0.65 | 0.65 | 0.65 | 0.65 |
| **Q (Runoff Depth, inches)** | 0.000107 | 0.042800 | 0.099011 | 0.141883 |
| **Runoff Volume (cubic feet)** | 3 | 1,357 | 3,139 | 4,499 |
| **Gravel Porosity** | 35% | 35% | 35% | 35% |
| **Needed Gravel Volume (cubic feet)** | 10 | 3,877 | 8,970 | 12,853 |
| **Infiltration Length (feet)** | 0.2 | 65 | 149 | 214 |

**Calculation Assumptions**

1. Accommodate runoff associated with the 85th percentile 24 hour event (0.65 inches) from entire acreage of drainage area DMA-2 (estimated 8.7 acres).
2. The calculation does not take into account the runoff capture due to existing sediment basins located on the west side of the property also within drainage area DMA-2.
3. This calculation does not take into account the infiltration capabilities of the trench system.
4. Cross-section dimensions of the trench for the calculation were assumed to be 6 feet deep by 10 feet wide. The actual observed trench width installed ranges from 10 to 14 feet wide.
5. For the purposes of sizing this trench/stormwater capture feature, we are conservatively assuming hydrologic soil group type D soils, which are classified as soil with moderately fine to fine textures, low infiltration rate and high runoff rate. This assumption results in a longer feature with a length of approximately 214 feet (assuming cross-sectional dimensions 6-feet x 10 feet, stated above).
6. This design does not guarantee providing a specific level of treatment. This calculation shows the design trench capacity will accommodate volume capture for the 85th percentile storm to allow for settling of sediment particles and infiltration.
7. Storms larger than the 85th percentile storm, or comparable intensities, may bypass the infiltration trench as soon as it is full.



**Phone:** (707) 441-8855 **Email:** info@shn-engr.com Web: shn-engr.com
812 W Wabash Avenue, Eureka, CA 95501

## USDA TR-55 Method Equations and References

### Runoff Equation

$$Q = \frac{(P - 0.2S)^2}{(P + 0.8S)} \qquad \text{[eq. 2-3]}$$

Q = runoff (in)
P = rainfall (in)
S = potential maximum retention after runoff begins (in) and

### Retention Equation

$$S = \frac{1000}{CN} - 10 \qquad \text{[eq. 2-4]}$$

### Curve Numbers (CN)

**Table 2-2a** Runoff curve numbers for urban areas 1/

| Cover description | | Curve numbers for hydrologic soil group | | | |
|---|---|---|---|---|---|
| Cover type and hydrologic condition | Average percent impervious area 2/ | A | B | C | D |
| *Fully developed urban areas (vegetation established)* | | | | | |
| Open space (lawns, parks, golf courses, cemeteries, etc.) 3/: | | | | | |
| Poor condition (grass cover < 50%) | | 68 | 79 | 86 | 89 |
| Fair condition (grass cover 50% to 75%) | | 49 | 69 | 79 | 84 |
| Good condition (grass cover > 75%) | | 39 | 61 | 74 | 80 |
| Impervious areas: | | | | | |
| Paved parking lots, roofs, driveways, etc. (excluding right-of-way) | | 98 | 98 | 98 | 98 |
| Streets and roads: | | | | | |
| Paved; curbs and storm sewers (excluding right-of-way) | | 98 | 98 | 98 | 98 |
| Paved; open ditches (including right-of-way) | | 83 | 89 | 92 | 93 |
| Gravel (including right-of-way) | | 76 | 85 | 89 | 91 |
| Dirt (including right-of-way) | | 72 | 82 | 87 | 89 |




General Cross Section
Infiltration Trench

**EXHIBIT D – Concrete Washout Area Drawings**



**K-rail wall**
**wall.**

**EXHIBIT E – Facility Fueling Area Drawings**


Exhibit E-Fueling Area
Fueling area with 4-inc
Area will be delineated
boundaries and signage
4" high rolling berm
FUELING AREA
4" high rolling berm
4" high rolling berm
FUELING AREA
4" high rolling berm
1993
DIESEL
2
2
CAT

**EXHIBIT F – Return Concrete Rubble Disposal Area**


Extend roof-lined bin
mark 6' in from roof
12'

**EXHIBIT G - Testing Parameters**

| **Parameter** | **Test Method** | **Reporting Units** | **Evaluation Level** | **Instantaneous Maximum NAL, If Applicable** |
|---|---|---|---|---|
| pH | See Section XI.C.2 of the General Permit | pH units | N/A | Less than 6.0 Greater than 9.0 |
| Total Suspended Solids | SM 2540-D | mg/L | 100 | 400 |
| Oil & Grease | EPA 1664A | mg/L | 15 | 25 |
| Iron | EPA 200.7 | mg/L | 1.0 | |
| Aluminum | EPA 200.8 | mg/L | 0.75 | |
| Nitrate plus Nitrite Nitrogen | SM4500-NO3-E | mg/L as N | 0.68 | |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods